UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

GROUP14 TECHNOLOGIES, INC.,

Plaintiff,

v.

NEXEON LIMITED,

Defendant.

C22-1354 TSZ

ORDER

THIS MATTER comes before the Court on (i) a motion brought by plaintiff Group14 Technologies, Inc. ("Group14") to dismiss the three counterclaims asserted by defendant Nexeon Limited ("Nexeon"), docket no. 42; and (ii) the parties' joint submission pursuant to Local Civil Rule 37, docket no. 51, which contains the parties' respective arguments concerning Group14's motion to compel.  Having reviewed all papers filed in support of, and in opposition to, each motion, as to which neither side has requested oral argument, the Court enters the following Order.

**<u>Background</u>**

Group14 is a Delaware corporation with its principal place of business in Washington.  *See* Compl. at ¶ 5 (docket no. 1).  Nexeon is a limited company organized in the United Kingdom ("UK") with offices in the UK and Japan.  *See id.* at ¶ 6; Am.

ORDER - 1

Answer at ¶ 6 (docket no. 47).  Group14 has developed certain technology relating to the use of silicon and carbon (both of which are within Group 14 on the Periodic Table of Elements) in connection with lithium-battery anodes.  *See* Compl. at ¶ 13; *see also* Am. Answer & Countercls. at ¶¶ 19–35 (docket no. 47 at 41–45).  In April 2016, Group14 and Nexeon entered into a Materials Transfer & Mutual Non-Disclosure Agreement ("Agreement" or "NDA"), pursuant to which the parties exchanged confidential materials and information for the "purpose of exploring the possibility of . . . collaboration."  NDA at 1, Ex. 1 to Compl. (docket no. 1-1 at 2).  The Agreement contained the following provisions:

> (c)    The Material and Confidential Information shall be used only for the Research Protocol.  Recipient specifically warrants and agrees that without the Discloser's prior written authorization, the Materials shall not be used in any research not described in a Research Protocol.
>
> (d)    The Recipient will hold in confidence and not directly or indirectly disclose, both during its relationship with the Discloser and for a period of three (3) years after termination [of] this Agreement . . . , any Confidential Information it obtains during the relationship, except to the extent authorized by the Discloser, until such Confidential Information becomes generally known or available.

*Id.* at ¶ 2 (docket no. 1-1 at 3).

In September 2022, Group14 commenced this action against Nexeon, asserting the following four claims:  (i) misappropriation of trade secrets pursuant to the Defend Trade Secrets Act,[1] (ii) misappropriation of trade secrets pursuant to Washington's Uniform

---

[1] The Defend Trade Secrets Act provides *inter alia* that "[a]n owner of a trade secret that is misappropriated may bring a civil action . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."  18 U.S.C. § 1836(b)(1).

1   Trade Secrets Act, RCW Chapter 19.108, (iii) breach of contract; and (iv) unjust

2   enrichment.  Compl. at ¶¶ 47–75 (docket no. 1).

3        Nexeon timely filed an answer and the following counterclaims:  (i) declaratory

4   judgment that Nexeon did not misappropriate Group14's trade secrets or breach the

5   NDA; (ii) tortious interference with business expectancy; (iii) violation of Washington's

6   Consumer Protection Act ("CPA"); and (iv) actual or attempted monopolization in

7   violation of Washington and federal law, namely RCW 19.86.030 and Section 2 of the

8   Sherman Act.  _See_ Answer & Countercls. (docket no. 28).  The Court granted Group14's

9   motion to dismiss the counterclaims, as well as Nexeon's statute-of-limitations defense,

10  but without prejudice and with leave to amend, except as to the declaratory judgment

11  counterclaim.[2]  Nexeon filed a redacted version of its amended responsive pleading on

12  June 6, 2023, docket no. 41, which was followed by an unredacted version submitted

13  under seal, docket no. 47, and Group14 has again moved to dismiss Nexeon's counter-

14  claims.[3]

---

[2] Although the Court dismissed with prejudice Nexeon's counterclaim for declaratory judgment, _see_ Order at 5 n.1 & 10–11 (docket no. 39), the Court hereby CLARIFIES that, given the posture of the case, Nexeon will be permitted to seek declaratory judgment as a remedy if it prevails in its defense to any of Group14's claims.

[3] Group14 has not, however, renewed its motion to strike Nexeon's affirmative defense that Group14's statutory (trade secret misappropriation) claims and its unjust enrichment claim are barred by the applicable three-year limitations periods.  _See_ Am. Answer at ¶ C (docket no. 47 at 36–37); _see also_ Pl.'s Mot. (docket no. 42).

ORDER - 3

**Discussion**

**A.**     **Motion to Dismiss**

A motion brought pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss a counterclaim is evaluated under the same standards applicable to a motion relating to a complaint.  *Nat'l Prods. Inc. v. Innovative Intelligent Prods., LLC*, No. C20-428, 2021 WL 4948165, at *2 (W.D. Wash. Oct. 25, 2021).  Although a pleading challenged by a Rule 12(b)(6) motion need not provide detailed factual allegations, it must offer "more than labels and conclusions" and contain more than a "formulaic recitation of the elements of a cause of action."  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  To survive a motion to dismiss, a pleading must indicate more than mere speculation of a right to relief.  *Id.*  A counterclaim may be lacking for one of two reasons:  (i) absence of a cognizable legal theory, or (ii) insufficient facts to support a cognizable basis for relief.  *See Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir. 1984).  In ruling on a Rule 12(b)(6) motion to dismiss a counterclaim, the Court must assume the truth of the allegations in the operative pleading and draw all reasonable inferences in the counterclaimant's favor.  *See*, *e.g.*, *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).  The question for the Court is whether the facts pleaded in support of the counterclaims sufficiently state "plausible" grounds for relief.  *See Twombly*, 550 U.S. at 570.

**1.**     **Tortious Interference with Business Expectancy**

In its first attempt to plead tortious interference with business expectancy, Nexeon failed to identify any third parties with which it had contractual relationships or any

1    business expectancy.  *See* Order at 6 (docket no. 39).  In its Amended Answer and

2    Counterclaims, Nexeon identifies by name six entities that have ceased negotiations with

3    it because of Group14's allegedly baseless claim of trade secret misappropriation.  *See*

4    Am. Answer & Countercls. at ¶¶ 51–54 (docket no. 47 at 48–49).  Nexeon asserts that

5    three of these businesses have a need for silicon-containing anode material beyond what

6    Group14 alone can supply, that Nexeon's competing "NSP-2" product was evaluated by

7    them and performed favorably, and that no reason (other than Group14's accusations)

8    existed for these potential customers to terminate contract negotiations.  *See id.* at ¶¶ 51–

9    52.  Nexeon also indicates that at least one firm has expressly stated in correspondence

10   that it was declining to proceed with further discussions because of this litigation.  *See id.*

11   at ¶ 53.  Group14 contends that Nexeon's pleading remains deficient because it does not

12   indicate what actions Group14 took to interfere with the business expectancies at issue.

13   The Court disagrees and concludes that Nexeon's tortious interference counterclaim is

14   sufficiently pleaded to survive Group14's Rule 12(b)(6) motion.

15        To establish tortious interference with a contractual relationship or business

16   expectancy, a plaintiff must prove: (i) the existence of a valid contractual relationship or

17   business expectancy; (ii) the defendant's knowledge of that relationship; (iii) the

18   defendant's intentional interference induced or caused a breach or termination of the

19   relationship or expectancy; (iv) the interference had an improper purpose or used an

20   improper means; and (v) resultant damage.  *Leingang v. Pierce Cnty. Med. Bureau, Inc.*,

21   131 Wn.2d 133, 157, 930 P.2d 288 (1997).  Nexeon alleges that it had a handful of

22   potential customers for its NSP-2 silicon-carbon composite material, the manufacturing

23

process for which is disclosed in U.S. Patent No. 10,424,786 (the "'786 Patent").  *See*

Am. Answer at ¶¶ 39–40 & Countercls. at ¶ 56 (docket no. 47 at 22–23 & 50); *see also*

'786 Patent (issued to Nexeon on Sep. 24, 2019).  Nexeon further asserts that Group14

contacted Nexeon's potential customers, informed them about the claims in this action,

which Group14 knew are meritless, and demanded that they "not deal with Nexeon."

Am. Answer & Countercls. at ¶¶ 58–61 (docket no. 47 at 50–51).  Accepting, as it must,

the truth of Nexeon's allegations, and drawing the reasonable inferences from them in the

light most favorable to Nexeon, the Court DENIES Group14's motion to dismiss the first

counterclaim for tortious interference with business expectancy.  The arguments raised in

Group14's motion are more appropriate for dispositive motion practice or trial.

### 2.    <u>Consumer Protection Act</u>

The Court previously dismissed Nexeon's CPA counterclaim for failure to

adequately allege a public interest.[4]  *See* Order at 8–9 (docket no. 39).  Group14 contends

that, notwithstanding Nexeon's additional allegations, the CPA counterclaim is still not

cognizable because this dispute is inherently a private one, which does not affect the

public interest.  The Court agrees.  The crux of Group14's misappropriation and other

claims against Nexeon is an alleged breach of a private contract, *i.e.*, the NDA, which

---

[4] To establish a violation of the CPA, a private plaintiff must prove:  (i) the defendant engaged in an unfair or deceptive act or practice; (ii) such act or practice occurred in the conduct of trade or commerce; (iii) such act or practice affected the public interest; (iv) the plaintiff suffered an injury to his or her business or property; and (v) a causal relationship exists between the defendant's act or practice and the plaintiff's injury.  *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 785-93, 719 P.2d 531 (1986).

1    does not affect the public interest.  Nexeon's CPA counterclaim is premised on Group14

2    having commenced this lawsuit and then allegedly publicized information about it to

3    Nexeon's potential customers.  _See_ Am. Answer & Countercls. at ¶¶ 65–70 (docket

4    no. 47 at 52–53).  In essence, the CPA counterclaim is duplicative of Nexeon's tortious

5    interference counterclaim, which is the epitome of a private dispute.  Indeed, Nexeon

6    makes no allegation that others have been or will be injured in exactly the same fashion.

7    _See_ _Sloan v. Thompson_, 128 Wn. App. 776, 792, 115 P.3d 1009 (2005) ("[I]t is the

8    likelihood that additional plaintiffs have been or will be injured in exactly the same

9    fashion that changes the factual pattern from a private dispute to one that affects the

10   public interest." (quoting _Hangman Ridge_, 105 Wn.2d at 790)).

11          Instead, Nexeon contends that, as a result of the aspersions that Group14 has

12   allegedly cast against it, lithium-battery manufacturers might have fewer options for

13   obtaining the necessary anode materials, which in turn might render batteries less

14   efficient and decrease the adoption of carbon-emission-reducing technologies, which

15   might harm the environment and therefore the public interest.  _See_ Am. Answer &

16   Countercls. at ¶ 69 (docket no. 47 at 53).  This type of slippery-slope or domino-effect

17   analysis is logically flawed and does not satisfy Washington's standards for establishing

18   public interest.  Nexeon has offered no basis for believing that it can cure the defect in its

19   pleading, and thus, with respect to Nexeon's CPA counterclaim, Group14's motion to

20   dismiss is GRANTED.  Nexeon's second counterclaim for violation of the CPA is

21   DISMISSED with prejudice.

22

23

### 3.   Monopolization

Nexeon's monopolization counterclaim was previously dismissed because it was pleaded using merely conclusory allegations. *See* Order at 7–8 (docket no. 39). Although Nexeon's amended pleading offers more specific content, it still fails to assert a plausible claim of actual or attempted monopolization under federal or state law.

### a.   Actual Monopolization

To establish actual monopolization under Section 2 of the Sherman Act,[5] a claimant must prove:  (i) the defendant possesses monopoly power in the relevant market; (ii) the defendant willfully acquired or maintains that power; and (iii) causal antitrust injury.  *Movie 1 & 2 v. United Artists Comm'cns, Inc.*, 909 F.2d 1245, 1254 (9th Cir. 1990).  The purpose of Washington's analogous statute, RCW 19.86.040,[6] is "to complement the body of federal law governing restraints of trade," and in construing this act, Washington courts are "guided by final decisions of the federal courts and final

---

[5] The Sherman Act provides *inter alia* that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court."  15 U.S.C. § 2.  The Sherman Act further authorizes "any person . . . injured in his business or property by reason of anything forbidden in the antitrust laws . . . [to] sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent."  15 U.S.C. § 15(a).

[6] The Washington legislature has declared "unlawful for any person to monopolize, or attempt to monopolize or combine or conspire with any other person or persons to monopolize any part of trade or commerce."  RCW 19.86.040.  "Any person who is injured in his or her business or property by a violation of . . . 19.86.040 . . . may bring a civil action in superior court to enjoin further violations, to recover the actual damages sustained by him or her, or both, together with the costs of the suit, including a reasonable attorney's fee."  RCW 19.86.090.

1    orders of the federal trade commission." *See* RCW 19.86.920; *see also* *Murray Publ'g*

2    *Co. v. Malmquist*, 66 Wn. App. 318, 325, 832 P.2d 493 (1992).

3          In moving to dismiss Nexeon's monopolization claim, Group14 contends that

4    Nexeon (i) has not adequately defined the "relevant market," (ii) has not sufficiently

5    pleaded that Group14 has monopoly power, and (iii) has not alleged the requisite willful

6    acquisition or maintenance of monopoly power.  The first assertion lacks merit,[7] and the

7    _____

8    [7] For purposes of the Sherman Act, the "relevant market" need not be pleaded with specificity,
     and an antitrust claim will survive a Rule 12(b)(6) attack concerning that element "unless . . . the
9    alleged market suffers a fatal legal defect" or is defined in a "facially unsustainable" manner.
     *See* *Newcal Indus., Inc. v. IKON Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008).  To qualify as
10   a "relevant market," the market must (i) involve a product, as opposed to a group of customers,
     (ii) "encompass the product at issue as well as all economic substitutes for the product,"
11   (iii) include sellers or producers who have "actual or potential ability to deprive each other of
     significant levels of business," and (iv) have a geographic scope.  *See id.* at 1045 & n.4.  The
12   relevant market that Nexeon has alleged satisfies these requirements.  Nexeon has described a
     global market for a category of products, namely silicon-containing anode materials suitable for
13   high-loading applications, that are supplied by five businesses, including Group14 and Nexeon.
     *See* Am. Answer & Countercls. at ¶¶ 50 & 73 (docket no. 47 at 48 & 53).  Group14 has not
14   explained why this relevant market is not plausible, and its contention that Nexeon's pleading is
     deficient because it does not cite "industry data, public statements, filings, reports, or other
15   market analysis," Pl.'s Mot. at 7 (docket no. 42), runs contrary to Rule 12(b)(6) standards and is
     not supported by the authorities on which it relies.  *See* *Sidibe v. Sutter Health*, 4 F. Supp. 3d
16   1160, 1174–75 (N.D. Cal. 2013) (agreeing with the plaintiffs that they were not required to plead
     the relevant markets with specificity and, after accepting the defendant's concession that the
17   defined "product" market was plausible, ruling that the plaintiffs had failed to identify the
     relevant "geographic" markets); *see also* *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063–65
18   (9th Cir. 2001) (without mentioning any failure to plead industry statistics, market reports, or the
     like, rejecting the plaintiff's proposed product market (UCLA women's soccer program) and
19   geographic market (Los Angeles) because they were based merely on her personal preference to
     remain "close to her family" and did not account for the interchangeability of women's soccer
20   programs or the nationwide scope of intercollegiate athletics); *Hicks v. PGA Tour, Inc.*, 897 F.3d
     1109, 1120–21 & n.8 (9th Cir. 2018) (reiterating that "plaintiffs need not plead a relevant market
21   with specificity," but concluding that the plaintiffs' proposed sub-submarkets were "not natural,"
     "artificial," and "contorted to meet their litigation needs"); *In re German Auto. Mfrs. Antitrust*
22   *Litig.*, 497 F. Supp. 3d 745, 757–59 (N.D. Cal. 2020) (reasoning, without resorting to empirical
     evidence, that "diesel passenger vehicles" do not constitute a relevant market because "*obvious*
     'economic substitutes'" are excluded (emphasis added)).

23

third argument seems to ignore the Court's previous rulings,[8] but the second contention

warrants dismissal of Nexeon's actual monopolization claim.

Monopoly power is "the power to control prices or exclude competition." *Khalid*

*v. Microsoft Corp.*, 409 F. Supp. 3d 1023, 1032 (W.D. Wash. 2019) (quoting *United*

*States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956)).  Market share does

not itself establish monopoly power, but it is "perhaps the most important factor to

consider" in assessing whether monopoly power exists.  *Movie 1 & 2*, 909 F.2d at 1254.

A market share as low as 45–70% might support a finding of monopoly power, but only

if accompanied by other factors, including "significant and continuing barriers" to market

entry.  *See id.*  "Even a 100% monopolist may not exploit its monopoly power in a

market without entry barriers." *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d

1195, 1208 (9th Cir. 1997); *see also Movie 1 & 2*, 909 F.2d at 1254 (observing that, in

---

[8] In an earlier Order rejecting Group14's contention that the *Noerr-Pennington* doctrine precluded Nexeon's counterclaims, the Court concluded that Nexeon had sufficiently pleaded the requisite initiation by Group14 of "sham" litigation for which Group14 may not assert immunity. *See* Order at 3–4 (docket no. 39).  Commencing a legal action can constitute anticompetitive behavior if the lawsuit is (i) objectively baseless; and (ii) "a concealed attempt to interfere with the plaintiff's business relationships." *Kottle v. Nw. Kidney Ctrs.*, 146 F.3d 1056, 1060 (9th Cir. 1998); *see also Freeman v. Lasky, Haas & Cohler*, 410 F.3d 1180, 1184 (9th Cir. 2005).  Nexeon asserts that Group14 "is seeking to acquire or maintain monopoly power through the predatory, exclusionary, and anticompetitive conduct alleged herein, including making objectively baseless claims that Nexeon stole trade secrets, warning Nexeon's actual or potential customers not to do business with Nexeon, by demanding exclusive dealing, and by pursuing this objectively baseless lawsuit." Am. Answer & Countercls. at ¶ 77 (docket no. 47 at 54–55).  These allegations are adequate to plausibly assert that Group14 has engaged in willful acquisition or maintenance of monopoly power.  Whether Group14's misappropriation of trade secrets, breach of contract, and unjust enrichment claims are objectively baseless and whether Group14 has attempted to interfere with Nexeon's business relationships by initiating this court case are questions for another day.

1   the absence of entry barriers, attempts to raise prices above competitive levels will serve

2   only to "lure into the market new competitors able and willing to offer their commercial

3   goods and personal services for less.").

4        Nexeon alleges that Group14 controls about 46% of the relevant market and that,

5   given Group14's plans to increase manufacturing capacity, Group14 will likely possess

6   an 82% share of the global market by the end of 2024.  Am. Answer & Countercls. at

7   ¶ 74 (docket no. 47 at 53–54).  Nexeon has not, however, identified any barriers to entry

8   in the global market for silicon-containing anode materials suitable for high-loading

9   applications,[9] and the share of the market attributed to Group14 is not sufficient on its

10  own to demonstrate an ability to control prices or exclude competition.  _See United States_

11  _v. Grinnell Corp._, 384 U.S. 563, 571 (1966) (indicating that monopoly power "may be

12  inferred from the predominant share of the market," and finding that an aggregate of 87%

13  of the business at issue "leaves no doubt" about the defendants' monopoly power (citing

14  _Am. Tobacco Co. v. United States_, 328 U.S. 781, 797 (1946) (involving price-fixing by

15  three companies that produced 80% of all domestic burley blend cigarettes), and _United_

16

17  ────────────────────

18  [9] Common entry barriers include "patents or other legal licenses, control of essential or superior resources, entrenched buyer preferences, high capital entry costs and economies of scale"  _Image_

19  _Tech. Servs._, 125 F.3d at 1208.  Although Nexeon has mentioned Group14's predecessor's international patent application, which was published in 2017, and Nexeon's own '786 Patent,

20  _see_ Am. Answer & Countercls. at ¶¶ 31 & 40 (docket no. 47 at 44 & 46), it has not alleged that others wishing to produce silicon-containing anode materials are inhibited from doing so by

21  Group14's (and/or Nexeon's) intellectual property rights.  Nexeon's silence on the subject must be viewed in the context of its allegation that three other companies already compete in the

22  relevant market, and the Court cannot infer from Nexeon's amended pleading that current or future patents present any barrier to market entry.

23

1    *States v. Aluminum Co. of Am.*, 148 F.2d 416, 424 (2d Cir. 1945) (observing that an over

2    90% market share "is enough to constitute a monopoly," but whether 60–64% percent

3    "would be enough" is "doubtful," and "certainly thirty-three per cent is not"))).[10]  Given

4    the failure to identify any barrier to entry in the relevant market, the Court is skeptical

5    that Nexeon can plead a plausible monopolization claim, but the Court cannot conclude

6    on the current record that amendment efforts would be futile, *see Lopez v. Smith*, 203

7    F.3d 1122, 1130 (9th Cir. 2000) ("a district court should grant leave to amend even if no

8    request to amend the pleading was made, unless it determines that the pleading could not

9    possibly be cured by the allegation of other facts"), and thus, Nexeon's actual

10   monopolization claim is DISMISSED without prejudice and with leave to amend.

11

12

13

_____

14   [10] To support its argument that a comparable market share has been deemed sufficient to survive
a motion to dismiss, Nexeon cites *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421 (9th Cir.

15   1995).  *See* Def.'s Resp. at 21 (docket no. 48).  Nexeon's reliance on *Rebel Oil* is misplaced.  In
*Rebel Oil*, the Ninth Circuit acknowledged that "numerous cases hold that a market share of less

16   than 50 percent is presumptively insufficient to establish market power" for purposes of actual
monopolization claims.  *Id.* at 1438.  *Rebel Oil*, however, involved an attempted monopolization

17   claim, *see id.* at 1432–33, and with respect to such claim, the Ninth Circuit observed that a lower
market share might suffice to establish market power "if entry barriers are high and competitors

18   are unable to expand their output in response to supracompetitive pricing," *id.* at 1438.  Despite
the more lenient market-share standard, the plaintiff in *Rebel Oil* still failed to present sufficient

19   evidence that the defendant, which allegedly controlled 44% of the "highly elastic" gasoline-
supply market in Las Vegas, was "dangerously close to obtaining the power to monopolize the

20   market."  *Id.* at 1437–38 & 1443.  The Ninth Circuit affirmed the district court's grant of
summary judgment in favor of the defendant on the plaintiff's Sherman Act claims, and the only

21   claim that survived after the Ninth Circuit's review was for price discrimination (manifested as
supracompetitve oligopoly pricing) in violation of the Clayton Act, which is not at issue in this

22   matter.  *See id.* at 1439–43 & 1448.  *Rebel Oil* does not bolster, but rather undermines, Nexeon's
contention that Group14's market share establishes market power.

23

1    **b.    <u>Attempted Monopolization</u>**

2    To prove attempted monopolization under either Section 2 of the Sherman Act or

3    Washington's analogous law, a claimant must show (i) specific intent to control prices or

4    destroy competition; (ii) predatory or anticompetitive conduct to accomplish the

5    monopolization; (iii) dangerous probability of success; and (iv) causal antitrust injury.

6    <u>See</u> <u>Rebel Oil</u>, 51 F.3d at 1432–33; <u>Movie 1 & 2</u>, 909 F.2d at 1254; <u>see also</u> <u>Boeing Co. v.</u>

7    <u>Sierracin Corp.</u>, 108 Wn.2d 38, 59, 738 P.2d 665 (1987) (reciting the same first, second,

8    and fourth elements, and concluding that "dangerous probability of success" may be

9    "inferred from specific intent and monopoly power").  An act is "anticompetitive" when

10   "it harms both allocative efficiency <u>*and*</u> raises the prices of goods above competitive

11   levels or diminishes their quality."  <u>Rebel Oil</u>, 51 F.3d at 1433 (emphasis in original).  To

12   unilaterally raise prices above competitive levels, a predator must obtain sufficient

13   market power to allow it to restrict marketwide output by limiting its own output and

14   thereby increase marketwide prices.  <u>Id.</u> at 1434.

15   Market power may be demonstrated through either (i) direct evidence, for

16   example, via proof of restricted output and supracompetitive prices, or (ii) circumstantial

17   evidence, by showing that the defendant has a dominant share of the relevant market,

18   which has significant barriers to entry and in which "existing competitors lack the

19   capacity to increase their output in the short run."  <u>See</u> <u>id.</u>  For the same reasons that

20   Nexeon's actual monopolization claim is not well pleaded, its attempted monopolization

21   claim must be dismissed.  Nexeon relies on the circumstantial approach to alleging the

22   requisite market power, but it has not identified any barrier to entry or indicated that

23

ORDER - 13

1   existing competitors cannot increase their output to combat any efforts by Group14 to set

2   supracompetitive prices or supply shoddy materials.[11]   Thus, Nexeon's attempted

3   monopolization claim is DISMISSED without prejudice and with leave to amend.

4   **B.**   **Discovery Disputes**

5          The parties' LCR 37 submission concerns Group14's motion to compel responses

6   from Nexeon with respect to two types of discovery requests:  (i) Group14's discovery

7   requests concerning Nexeon's counterclaims; and (ii) Group14's discovery requests

8   aimed at gathering evidence to support its trade secret misappropriation claims.  In light

9   of the Court's rulings dismissing Nexeon's CPA and antitrust counterclaims, the

10  discovery disputes related to those claims are now moot.  _See_ Parties' LCR 37

11  Submission at 8 n.3 (docket no. 51).  With regard to all but one of the remaining

12  discovery disputes, the parties disagree concerning whether they have engaged in the

13  requisite meet-and-confer process.  _See id._ at 2–3, 18, & 31–32; _see also_ LCR 37(a)(1).

14

15

---

16

17  [11] Nexeon asserts that the "sole basis" on which Group14 seeks to dismiss Nexeon's attempted
    monopolization counterclaim is a failure to sufficiently plead specific intent.  _See_ Def.'s Resp. at
    14 (docket no. 48).  The Court does not agree with Nexeon's characterization of Group14's

18  motion.  In both its opening brief and its reply, Group14 challenged the adequacy of Nexeon's
    allegation of market power, citing cases involving both actual and attempted monopolization.

19  _See_ Pl.'s Mot. at 9–10 (docket no. 42) (citing _Khalid_, 409 F. Supp. 3d at 1033, and _Randy's Ring_
    _& Pinion Serv. Inc. v. Eaton Corp._, No. C09-637, 2009 WL 10727790 (W.D. Wash. Nov. 16,
    2009)); _see also_ Pl.'s Reply at 6–7 (docket no. 49) (citing _United States v. Syufy Enters._, 903

20  F.2d 659 (9th Cir. 1990)).  Given its ruling regarding Group14's "market power" argument, the
    Court need not address the issue of specific intent, except to note that, in some cases, specific

21  intent may be inferred from proof of predatory or anticompetitive behavior, _Janich Bros., Inc. v._
    _Am. Distilling Co._, 570 F.2d 848, 853–54 (9th Cir. 1977), and that intent need not be pleaded

22  with particularity, but instead, may be alleged generally, _see_ Fed. R. Civ. P. 9(b).

23

1    The issue about which the parties agree they have conferred involves one of

2    Nexeon's objections to Group14's discovery requests.  Nexeon has taken the position that

3    it need not provide certain information and/or documents until Group14 has sufficiently

4    defined the scope of its trade secrets.  On this matter, the parties are at an impasse, _see_

5    Lindberg Decl. at ¶ 9 & Exs. C & D (docket nos. 53, 53-3, & 53-4); Ex. 7 to Knight Decl.

6    (docket no. 52-7), and the Court will address this subject first, before turning to the other

7    discovery matters.

8        **1.      Identifying Trade Secrets**

9        In connection with the parties' current discovery dispute, Group14 quotes the

10   Court's earlier ruling that "[t]he complaint serviceably identifies the subject-matter of the

11   trade secret."  _See_ Parties' LCR 37 Submission at 14 (docket no. 51) (quoting Minute

12   Order at 2 n.1 (docket no. 27)).  The standard on which this conclusion was based,

13   however, concerns only what a publicly-available pleading must include to survive a

14   Rule 12(b)(6) motion to dismiss,[12] and it does not apply to discovery responses.  _See_

15   _RealD Spark LLC v. Microsoft Corp._, No. 22-cv-942, 2023 WL 3304250, at *3 (W.D.

16   Wash. May 8, 2023).  Information to be exchanged privately between the parties during

17   the discovery process is subject to a different set of rules.  _See_, _e.g._, Fed. R. Civ. P. 26(b).

18   An underlying principle is that "[r]efining trade secret identifications through discovery

19

20   _____

21   [12] To withstand a Rule 12(b)(6) challenge, a "complaint need not 'spell out the details of the
     trade secret,'" but it "must identify the trade secret 'with sufficient particularity . . . to permit the
     defendant to ascertain at least the boundaries within which the secret lies.'"  _Bombardier Inc. v._
22   _Mitsubishi Aircraft Corp._, 383 F. Supp. 3d 1169, 1178 (W.D. Wash. 2019).

23

makes good sense." *InteliClear, LLC v. ETC Global Holdings, Inc.*, 978 F.3d 653, 662

(9th Cir. 2020).  This principle acknowledges "the inherent tension between a party's

desire to protect legitimate intellectual property claims and the need for intellectual

property law to prevent unnecessary obstacles to useful competition." *Id.*  The Court

must balance a plaintiff's commercially-valid and/or strategic reasons for avoiding

specificity in describing its trade secrets[13] against a defendant's, as well as the Court's,

needs in understanding the scope of the alleged trade secrets.[14]

---

[13] *See IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 583 (7th Cir. 2002) ("the more precise the claim, the more a party does to tip off a business rival to where the real secrets lie and where the rival's own development efforts should be focused"); *DeRubeis v. Witten Techs., Inc.*, 244 F.R.D. 676, 680 (N.D. Ga. 2007) (a "trade secret plaintiff, particularly if it is a company that has hundreds or thousands of trade secrets, may have no way of knowing what trade secrets have been misappropriated until it receives discovery on how the defendant is operating"); Kevin R. Casey, *Identification of Trade Secrets During Discovery: Timing and Specificity*, 24 AM. INTELL. PROP. L. ASS'N Q. J. 191, 202 (1996) ("'Satisfying the requirement of detailed disclosure of the trade secrets without knowledge [of] what the defendant is doing can be very difficult.  If the list is too general, it will encompass material that the defendant will be able to show cannot be trade secret.  If instead it is too specific, it may miss what the defendant is doing.'  Faced with this 'Catch22' dilemma, trade secret plaintiffs often are forced to define broadly the trade secrets that the defendant may have misappropriated.  Some courts have found a broad identification of trade secrets acceptable, at least at an early stage of the proceedings.  Other courts have not." (footnotes omitted)).

[14] *DeRubeis*, 244 F.R.D. at 680–81 (requiring a plaintiff to sufficiently describe its trade secrets at the outset of discovery (i) discourages "fishing expeditions" concerning the defendant's trade secrets, (ii) ensures the specificity necessary to know whether materials sought in discovery are relevant, (iii) provides the defendant with the information necessary to mount a defense, and (iv) prevents a plaintiff from "mold[ing] its cause of action around the discovery it receives"); *see RealD*, 2023 WL 3304250, at *7 (noting that a party might easily "allege theft of trade secrets with vagueness" and then use discovery from a defendant's files to "cleverly specify whatever happens to be there" as stolen trade secrets (quoting *Jobscience, Inc. v. CVPartners, Inc.*, No. C 13-4519, 2014 WL 1724763, at *2 (N.D. Cal. May 1, 2014))); *BioD, LLC v. Amnio Tech., LLC*, No. 13-cv-1670, 2014 WL 3864658, at *4 (D. Ariz. Aug. 6, 2014) ("requiring the plaintiff to sufficiently identify its trade secrets prior to allowing discovery on the defendant's trade secrets helps the court to determine the outer permissible bounds of discovery and prevents needless exposure of the defendant's trade secrets" (quoting *DeRubeis*, 244 F.R.D. at 680–81)).

In *RealD*, which was mentioned in the parties' LCR 37 submission, the court cited an article by the Sedona Conference, a nonpartisan, nonprofit research and educational institute dedicated to the advanced study of law and policy in certain areas, including intellectual property rights.  *See RealD*, 2023 WL 3304250, at *3–4.  The Sedona Conference has articulated four (4) principles and eight (8) guidelines concerning the identification of trade secrets in misappropriation cases.  *See* The Sedona Conference, *Commentary on the Proper Identification of Asserted Trade Secrets in Misappropriation Cases*, 22 SEDONA CONF. J. 223 (2021).  The following principles and guidelines are relevant to the current dispute:

> **Principle No. 2**:  The party claiming misappropriation of a trade secret should identify in writing the asserted trade secret at an early stage of the case.
>
> **Principle No. 3**:  The party claiming the existence of a trade secret must identify the asserted trade secret at a level of particularity that is reasonable under the circumstances.
>
> **Guideline 4**:  The identification of an asserted trade secret under a protective order or equivalent agreement between the parties should be made with sufficient particularity to allow the defendant to meaningfully compare an asserted trade secret to information that is generally known or readily ascertainable and to permit the parties and the court to understand what information is claimed to be a trade secret.
>
> **Guideline 6**:  The plaintiff should not identify an asserted trade secret exclusively by reference to a document or other item, or exclusively by cross-reference to another asserted trade secret, unless such document, other item, or cross-reference sets forth the asserted trade secret.

*Id.* at 231–33.  These principles and guidelines are consistent with the Ninth Circuit's adoption of a "reasonable specificity" standard, *see Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1167 (9th Cir. 1998), and its admonition that a plaintiff may not simply

"cite and incorporate by reference hundreds of documents that purportedly reference or reflect the trade secret information," _InteliClear_, 978 F.3d at 658; _see_ _RealD_, 2023 WL 3304250, at \*6.  "[A] plaintiff who seeks relief for misappropriation of trade secrets must identify the trade secrets and carry the burden of showing that they exist." _MAI Sys. Corp. v. Peak Comput., Inc._, 991 F.2d 511, 522 (9th Cir. 1993); _Boeing_, 108 Wn.2d at 49 ("A plaintiff seeking to establish a trade secrets claim under the uniform act has the burden of proving that legally protectable secrets exist."); _see also_ _RealD_, 2023 WL 3304250, at \*3 ("[I]f trade secrets are not specifically identified, a court will not be able to determine whether they have been misappropriated.").

The term "trade secret" is defined in similar fashion under both federal and Washington law, namely as information that (i) derives independent economic value from not being generally known, and (ii) is subject to reasonable efforts to maintain its confidentiality.[15]  Information disclosed in a published patent application is not eligible for protection as a trade secret.  _Ultimate Timing, L.L.C. v. Simms_, 715 F. Supp. 2d 1195, 1207 (W.D. Wash. 2010).  In its operative pleading, Group14 indicates that, on

---

[15] _See_ 18 U.S.C. § 1839(3) (defining "trade secret" as "all forms and types of financial, business, scientific, technical, economic, or engineering information . . . if . . . (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information"); RCW 19.108.010(4) (defining "trade secret" as "information, including a formula, pattern, compilation, program, device, method, technique, or process that: (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy").

1   August 28, 2015, several months before Group14 and Nexeon entered into their NDA

2   and exchanged confidential materials, Group14 filed a provisional[16] patent application

3   (No. 62/211,593) concerning aspects of its processes for creating silicon-carbon

4   composites.  *See* Compl. at ¶ 14 (docket no. 1).  Group14's related (nonprovisional)

5   patent applications eventually ripened into several patents.[17]  According to Group14, one

6   or more of the inventions described in these patents first became public on March 3,

7   2017, when an international application filed by its predecessor, EnerG2 Technologies,

8   Inc. ("EnerG2"), was published.  *See* Compl. at ¶¶ 12 & 14 (docket no. 1).[18]

9       Almost two years after this publication date, Nexeon filed the application that

10   gave rise to its '786 Patent, which Group14 alleges is the product of trade secret

11

12   ───────────────────

13   [16] *See* 35 U.S.C. § 111(b) (authorizing the filing of a provisional patent application without any
     formal patent claim or information about prior art); *see also id.* at § 122(b)(2)(A)(iii) (indicating
14   that provisional patent applications are generally not published); https://www.uspto.gov/patents/
     basics/apply/provisional-application (explaining that "provisional applications are not examined"
15   and that they "cannot result in a U.S. patent" unless within 12 months either (i) "a corresponding
     nonprovisional application for patent . . . is filed," or (ii) "a grantable petition . . . to convert the
16   provisional application into a nonprovisional application is filed").

17   [17] *See* United States Patents Nos. 10,147,950 (issued Dec. 4, 2018), 10,608,254 (issued Mar. 31,
     2020), 10,756,347 (issued Aug. 25, 2020), 10,784,512 (issued Sep. 22, 2020), 10,923,722
18   (issued Feb. 16, 2021), 11,437,621 (issued Sep. 6, 2022), 11,495,798 (issued Nov. 8, 2022), &
     11,646,419 (issued May 9, 2023).

19   [18] EnerG2's international application was not, however, published until March 9, 2017.  *See* Int'l
     Publ'n No. WO 2017/040299.  Meanwhile, the application that ripened into United States Patent
20   No. 10,147,950 was eligible for publication on March 2, 2017.  *See* 35 U.S.C. § 122(b)(1); *see
     also* https://www.uspto.gov/patents/laws/american-inventors-protection-act-1999/helpful-hints-
21   regarding ("The projected publication date of an application is the Thursday after the date that is
     eighteen months after the earliest filing date claimed by the applicant.").  Because these various
22   dates are not meaningfully different, for purposes of discussing the trade secret confidentiality
     criterion, the Court will use the date alleged in the operative pleading.

23

ORDER - 19

misappropriation.  *See* '786 Patent (Application No. 16/274,187 (filed Feb. 12, 2019));

*see also* Compl. at ¶¶ 3, 16, 24, 33, 39–40, & 45 (docket no. 1) (referencing Nexeon's

"patents," but identifying with specificity only the patent "published on September 24,

2019," *i.e.*, the '786 Patent).  Notably, Nexeon's '786 Patent cites as prior art both (i) the

first of Group14's suite of patents relating to the previously mentioned provisional patent

application, namely United States Patent No. 10,147,950 (the "'950 Patent"),[19] and

(ii) one of Group14's published patent applications, which eventually matured into

United States Patent No. 10,454,103 (the "'103 Patent").[20]  Apparently recognizing that

the composite materials and manufacturing methods disclosed in Group14's own patents

(*i.e.*, the '950 and '103 Patents) cannot qualify as trade secrets vis-à-vis Nexeon's

subsequently secured '786 Patent, Group14 pleaded four categories of confidential

information that are allegedly beyond what is described or claimed in its patents:

> (1) pourous carbon properties to support optimal silicon properties and battery cell stability and performance; (2) optimal Si-C composite properties, such as silicon loading and the location of silicon within the Si-C composite; (3) methods for determining the optimal Si-C composite properties; and (4) manufacturing processes including process designs, detailed process steps and parameters to achieve commercially viable Si-C composite Battery Active Materials ("BAM"), reactor-type selection, reactor design features, vendors, and suppliers.

---

[19] In addition, in Nexeon's '786 Patent, the patent examiner cited Pub. No. US 2017/0170477, which made public as of June 15, 2017, EnerG2's Application No. 15/248,830, which resulted in Group14's '950 Patent.

[20] The '103 Patent stemmed from Group14's Application No. 15/675,462, which was published on November 30, 2017, and which was a continuation of an application filed on November 19, 2013, and related to provisional applications filed in March and June 2013, respectively.  *See* Pub. No. US 2017/0346084.

ORDER - 20

1    Compl. at ¶ 16; _see id._ at ¶ 33.  Group14 also described its trade secrets as including

2    "manufacturing processes, know-how, and precise measurements and properties."  _Id._ at

3    ¶ 15.  Nexeon has propounded discovery requests seeking clarification concerning what

4    Group14 believes are its trade secrets, and in the absence of answers with which it is

5    satisfied, Nexeon has refused to respond to a number of Group14's discovery requests.

6                    **a.    Nexeon's Interrogatory No. 1**

7            Nexeon has asked Group14 to "[i]dentify all facts and documents sufficient to

8    show with reasonable specificity the 'manufacturing processes, know-how, and precise

9    measurements and properties'" that Group14 contends are maintained as trade secrets.

10   _See_ 2d Supp. Resp. to Interrog. No. 1, Ex. G to to Lindberg Decl. (docket no. 55-1 at 7).[21]

11   In its initial and first supplemental response, Group14 invoked attorney-client privilege

12   and the work-product doctrine, objected on the ground that the request sought allegedly

13   confidential information, and indicated that it would amend to identify by Bates number,

14   pursuant to Federal Rule of Civil Procedure 33(d), any responsive, non-privileged

15   documents in its possession.  _Id._ (docket no. 55-1 at 7–8).  In its second supplemental

16   response, Group14 incorporated by reference its prior objections, but it also provided a

17   roughly ten-page answer.  _Id._ (docket no. 55-1 at 8–18).  The first paragraph of this

18   substantive response merely repeats the fourth category of trade secrets set forth in the

19

20   _____

21   [21] Although this document has been filed under seal, the portions quoted by the Court do not
     satisfy the "good cause" standard for shielding material from public view, and no reason exists
22   for this Order to be sealed.  _See Kamakana v. City & County of Honolulu_, 447 F.3d 1172, 1179–
     80 (9th Cir. 2006).

23

1    Complaint.  *Id.* (docket no. 55-1 at 8).  The rest of Group14's answer summarizes in very

2    broad terms the information allegedly provided to Nexeon during presentations and tours

3    of Group14's facilities between November 2016 and October 2017.  *See id.* (docket

4    no. 55-1 at 8–18).

5         Nexeon has alleged in its responsive pleading that Group14 did not approach it

6    with a proposal to study the silicon-carbon composite at issue (*i.e.*, a material created by

7    depositing nano-silicon into a porous carbon structure using silane gas) until after

8    EnerG2's international patent application had already been published in March 2017.  *See*

9    Am. Answer & Countercls. at ¶¶ 30–31 (docket no. 47 at 44).  For purposes of Group14's

10   Rule 12(b)(6) motion, the Court has assumed the truth of this allegation, and the sequence

11   of events, as recited by Nexeon, suggests that some of the information enumerated in

12   Group14's answer to Nexeon's first interrogatory might have been publicly available

13   when it was provided to Nexeon.  For example, Group14 lists as trade secret information

14   disclosed to Nexeon, during meetings held in June 2017, a certain "[u]se of a silicon-

15   containing precursor," 2d Supp. Resp. to Interrog. No. 1 at 10 (first bullet point), Ex. G to

16   to Lindberg Decl. (docket no. 55-1 at 11), but the '950 Patent seems to describe this and

17   other embodiments in full detail, *see* '950 Patent at Col. 132 (Embodiments 72–76).

18        In describing its trade secrets, Group14 has not even mentioned its patents or

19   published patent applications or described with *any*, let alone *sufficient*, specificity the

20   information that was both (i) not disclosed in those publicly-available documents, and

21   (ii) allegedly used by Nexeon in developing or manufacturing its NSP-2 product and/or

22   seeking its own patents.  In arguing that it has nevertheless satisfied its obligation to

23

1   summarize its trade secrets with reasonable particularity, Group14 cites to _Redfin Corp._

2   _v. iPayOne.com, LLC_, No. C17-1217, 2018 WL 1397482 (W.D. Wash. Mar. 20, 2018).

3   In _Redfin_, the plaintiff sought a declaratory judgment that it had not misappropriated the

4   defendant's trade secrets under federal or state law.  _Id._ at *1.  The _Redfin_ Court denied

5   the plaintiff's motion to compel a more complete response to an interrogatory seeking a

6   description of every trade secret allegedly misappropriated.  _Id._ at *2.

7       _Redfin_ is distinguishable.  In response to the interrogatory at issue, the defendant

8   in _Redfin_ had indicated that it did not recall what information had been provided to the

9   plaintiff pursuant to a nondisclosure agreement, and thus, it could not identify all of the

10  trade secrets that were allegedly misappropriated.  _Id._  The defendant also represented

11  that it had answered the interrogatory to the best of its ability.  _Id._  In contrast, in this

12  matter, in response to Nexeon's interrogatory asking Group14 to identify its trade secrets,

13  Group14 does not assert a lack of memory or indicate that it has answered "to the best of

14  its ability."  Rather, Group14 has stated that "[d]iscovery is in its early stages and

15  ongoing," and that it will supplement its response, "if necessary, at the appropriate time."

16  _See_ 2d Supp. Resp. to Interrog. No. 1, Ex. G to Lindberg Decl. (docket no. 55-1 at 17).

17      _Redfin_ is also unpersuasive.  The _Redfin_ Court viewed the plaintiff's motion to

18  compel as seeking a determination that the defendant had failed to define its trade secrets

19  to the extent required to state a claim for misappropriation, and ruled that the discovery

20  motion was "not the proper procedural avenue" to request such essentially dispositive

21  relief.  2018 WL 1397482, at *2.  The Sedona Conference, however, has explained that a

22  ruling on the sufficiency of a party's identification of an asserted trade secret is not an

23

1   adjudication on the merits; whether a trade secret has been adequately described is "a

2   procedural notice issue -- a drafting step to provide clarity so that merits issues can

3   separately and later be determined in a facilitated manner."  22 Sedona Conf. J. at 243.

4   The Court adopts this view and concludes that Group14's response to Nexeon's first

5   interrogatory is simply "too vague and broad to provide reasonable particularity sufficient

6   for [Nexeon] to prepare a defense."  *RealD*, 2023 WL 3304250, at *4.

7               **b.      Nexeon's Interrogatory No. 2**

8               With regard to the four categories of trade secrets outlined in Paragraphs 16 and

9   33 of the Complaint, Nexeon requested that Group14 "[i]dentify all documents and facts

10  supporting the contention that [it] owned or acquired certain confidential information

11  relating to each alleged trade secret prior to any alleged act of misappropriation by

12  Nexeon."  *See* 2d Supp. Resp. to Interrog. No. 2, Ex. G to Lindberg Decl. (docket

13  no. 55-1 at 18).  After offering the same objections as stated in response to Nexeon's first

14  interrogatory, Group14 answered the second interrogatory by providing Bates numbers

15  for documents from which responsive information might be obtained with respect to the

16  first three categories of trade secrets and incorporating by reference its response to

17  Interrogatory No. 1 in connection with the fourth category of trade secrets.  *Id.* (docket

18  no. 55-1 at 18–21).  For the reasons previously articulated, the cross-reference to the

19  answer to Interrogatory No. 1 is an insufficient response.  Because the materials

20  identified pursuant to Rule 33(d) are not part of the record, the Court cannot determine

21  whether Group14's listing of Bates numbers is consistent with the Sedona Conference's

22  Guideline 6 and decisions of this district applying a similar standard.  *See RealD*, 2023

23

WL 3304250, at *6; *Zunum Aero, Inc. v. Boeing Co.*, No. C21-896, 2022 WL 17904317, at *5 (W.D. Wash. Dec. 23, 2022).

Group14, however, is the moving party, and it seeks to compel Nexeon to provide certain discovery responses despite Nexeon's objection that Group14 has not adequately identified its trade secrets.  Group14 will not be permitted to use the discovery process to help it define the scope of its trade secrets.  *RealD*, 2023 WL 3304250, at *7 ("A true trade secret plaintiff ought to be able to identify, up front, and with specificity the particulars of the trade secrets without any discovery." (quoting *Jobscience*, 2014 WL 1724763, at *2).  To the extent that Nexeon has refused to answer Group14's discovery requests on the ground that Group14 has not identified the asserted trade secrets "at a level of particularity that is reasonable under the circumstances," 22 SEDONA CONF. J. at 231 (Principle No. 3), Group14's motion to compel is DENIED.

## 2.   **Nexeon's Remaining Counterclaim**

Group14 is entitled to discovery concerning the evidence in Nexeon's possession that allegedly supports Nexeon's counterclaim for tortious interference with business expectancy.  Nexeon has objected to Group14's requests for production ("RFPs") as overbroad, unduly burdensome, seeking irrelevant documents, being disproportionate to the needs of the case, calling for proprietary and trade secret information, and inquiring about materials protected by attorney-client privilege or the work-product doctrine.  *See* Resp. to RFPs Nos. 60–64, Ex. 5 to Knight Decl. (docket no. 55).  Nexeon has also, however, indicated that, subject to and without waiving these objections, it will produce any located "non-privileged and relevant documents responsive to" Group14's requests.

1  *Id.*  The Court is not persuaded that Nexeon has failed to comply with its discovery

2  obligations, and Group14's motion to compel responses to RFPs Nos. 60–64 is therefore

3  DENIED.

4         **3.**     **Other Discovery Disputes**

5         Having reviewed Nexeon's responses to the other discovery requests as to which

6  Group14 seeks an order compelling an answer or production, as well as the submitted

7  correspondence between counsel, the Court is not satisfied that the parties have conferred

8  and reached an impasse.  The Court therefore declines to further consider Group14's

9  motion to compel, and it is otherwise DENIED.  The Court also declines Nexeon's

10  request to impose sanctions on Group14.  Counsel are encouraged to work cooperatively

11  to complete discovery, but if they are persistently unable to resolve their disputes, then

12  they should file a Joint Status Report proposing alternatives to filing discovery motions,

13  for example, appointment of a special discovery master who would be compensated by

14  the parties.

15  **Conclusion**

16         For the foregoing reasons, the Court ORDERS:

17         (1)     Group14's motion to dismiss, docket no. 42, is GRANTED in part and

18  DENIED in part, as follows:  (a) Nexeon's CPA counterclaim is DISMISSED with

19  prejudice; (b) Nexeon's antitrust counterclaim is DISMISSED without prejudice and with

20  leave to amend within fourteen (14) days of the date of this Order; and (c) Group14's

21  motion to dismiss Nexeon's counterclaim for tortious interference with business

22  expectancy is DENIED;

23

(2)     Group14's motion to compel discovery, docket no. 51, is DENIED, and Nexeon's related request that Group14 be sanctioned is DENIED; and

(3)     The Clerk is directed to send a copy of this Order to all counsel of record.

IT IS SO ORDERED.

Dated this 1st day of November, 2023.

Thomas S. Zilly
United States District Judge

ORDER - 27