1

2

3

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

4

5

GROUP14 TECHNOLOGIES, INC.,

6

Plaintiff,

7

v.

C22-1354 TSZ

8

NEXEON LIMITED,

ORDER

9

Defendant.

10

THIS MATTER comes before the Court on a renewed motion to compel discovery

11

brought by plaintiff Group14 Technologies, Inc. ("Group14"). Group14's motion, the

12

response of defendant Nexeon Limited ("Nexeon"), and Group14's reply are set forth in

13

the parties' joint submission pursuant to Local Civil Rule 37, docket nos. 65 (redacted)

14

and 68 (sealed). Having reviewed all papers filed in support of, and in opposition to, the

15

motion, the Court enters the following Order.

16

**Background**

17

**A.    Group14's Intellectual Property**

18

Group14 is the assignee and/or applicant on at least twenty-five (25) U.S. patents.

19

These patents disclose composite materials that are useful in electrical energy storage

20

applications, for example, rechargeable lithium-ion batteries, and methods or processes

21

for manufacturing them. *See*, *e.g.*, U.S. Patents Nos. 10,147,950 ("'950 Patent") and

22

10,454,103 ("'103 Patent"). A rechargeable lithium-ion battery consists of an anode, a

23

ORDER - 1

cathode, a separator, an electrolyte, and two current collectors (positive and negative).

*See* https://www.energy.gov/energysaver/articles/how-lithium-ion-batteries-work.

Positively charged lithium ions are carried by the electrolyte from the anode to the

cathode and vice versa through the separator.  *Id.*  When moving from the anode to the

cathode (or discharging), the lithium ions generate an electrical current that powers a

device attached to the current collectors.  *Id.*  During the recharging process, lithium ions

are released from the cathode and returned to the anode.  *Id.*  Traditional lithium-ion

batteries consist of a graphitic carbon anode and a metal oxide cathode.  '950 Patent at

1:57–59; '103 Patent at 1:24–26.  The carbon anode stores lithium between layered

graphite sheets or, in other words, lithium is "intercalated" between the sheets of carbon.

*See* '950 Patent at 1:55–57; '103 Patent at 22–24.  Group14's patents describe a

substitute substance for anodes, namely a silicon-carbon ("Si-C") composite that is

comprised of a porous carbon scaffold impregnated with silicon.  '950 Patent at 1:19–24.

A process for preparing an Si-C composite is disclosed in the '103 Patent, which has two

independent claims, the first of which outlines a

> method comprising contacting an amorphous activated porous carbon
> material having a total pore volume ranging from 0.6 cc/g to 1.0 cc/g with a
> gas comprising silane at a temperature of 450℃, thereby depositing
> elemental silicon in a pore of the porous carbon material to form the silicon-
> carbon composite.

'103 Patent at 85:2–8 (Claim 1).  The other independent claim is almost identical, except

that it delineates exposing carbon to silane gas at temperatures of "between 450℃ and

500℃."  *Id.* at 86:2–7 (Claim 10).  Additional steps in the process and other methods of

producing Si-C composites are discussed in the '950 Patent, but the '950 Patent does not

itself assert any proprietary rights in those steps or methods.  *See* '950 Patent at 133:35–134:62.

Notwithstanding its suite of patents, which disclosed to the world and extinguished any trade-secret protection for the inventions described therein,[1] Group14 asserts that Nexeon misappropriated its trade secrets in violation of the Defend Trade Secrets Act ("DTSA") and Washington's Uniform Trade Secrets Act ("WUTSA").  *See* Compl. at ¶¶ 47–63 (docket no. 1).  In its operative pleading, Group14 alleges that it

> owns and possesses certain confidential, proprietary, and trade secret information and know-how regarding: (1) porous carbon properties to support optimal silicon properties and battery cell stability and performance; (2) optimal Si-C composite properties, such as silicon loading and the location of silicon within the Si-C composite; (3) methods for determining the optimal Si-C composite properties; and (4) manufacturing processes including process designs, detailed process steps and parameters to achieve commercially viable Si-C composite BAM [Battery Active Materials], reactor-type selection, reactor design features, vendors, and suppliers.

*Id.* at ¶¶ 49 & 57.  Group14 contends that Nexeon acquired information from Group14 under the terms of a non-disclosure agreement ("NDA") and then breached the NDA

---

[1] The term "trade secret" is defined in similar fashion under both federal and Washington law, namely as information that (i) derives independent economic value from not being generally known, and (ii) is subject to reasonable efforts to maintain its confidentiality.  *See* 18 U.S.C. § 1839(3); RCW 19.108.010(4).  Publication of information in a patent or a patent application eliminates any trade secrecy.  *Attia v. Google LLC*, 983 F.3d 420, 426 (9th Cir. 2020) (citing *Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1355 (Fed. Cir. 2009) ("[D]isclosure of a trade secret in a patent places the information comprising the secret into the public domain.  Once the information is in the public domain and the element of secrecy is gone, the trade secret is extinguished and the patentee's only protection is that afforded under the patent law.")); *see BondPro Corp. v. Siemens Power Generation, Inc.*, 463 F.3d 702, 706–07 (7th Cir. 2006); *Ultimate Timing, L.L.C. v. Simms*, 715 F. Supp.2d 1195, 1207 (W.D. Wash. 2010).

ORDER - 3

by using such knowledge to apply for patents,[2] promote Group14's Si-C composite materials as Nexeon's "NSP-2" product, and induce a third-party (Ingevity Corporation) to invest $60 million to expand Nexeon's production capability.  *See id.* at ¶¶ 40, 42–45, 51, & 59.  In its responsive pleading, Nexeon represents that NSP-2 "differs significantly from any of the Si-C composite materials provided to Nexeon by Group14 in 2017" and that "NSP-2 was independently developed."  Ans. at 38, ¶ 4 (docket no. 47).

**B.**    **Ongoing Discovery Dispute**

Group14 has propounded numerous discovery requests seeking information and documents to support its DTSA and WUTSA claims, as well as its defenses to Nexeon's counterclaim,[3] but Nexeon has declined to substantively respond because it does not believe that Group14 has defined its alleged trade secrets with sufficient particularity.  In connection with Group14's previous motion to compel discovery, the Court concluded that, based on the record at the time, Nexeon's position was warranted, and it denied the motion.  *See* Order at 14–27 (docket no. 56).  The Court explained that Group14 would "not be permitted to use the discovery process to help it define the scope of its trade

---

[2] Nexeon is the applicant and assignee on U.S. Patent No. 10,424,786 ("'786 Patent"), which cites, as prior art, Group14's '950 Patent and the published application (2017/0346084 A1) for Group14's '103 Patent.  *See* '786 Patent at 1 (References Cited).

[3] In addition to denying Group14's assertions of wrongdoing, Nexeon has counterclaimed against Group14 for tortious interference with business expectancy.  Ans. at ¶¶ 55–63 (docket no. 47).  Nexeon also asserted counterclaims pursuant to Washington's Consumer Protection Act ("CPA") and federal and state antitrust laws; the CPA counterclaim was dismissed with prejudice, Order at 6–7 (docket no. 56), and the counterclaim for actual or attempted monopolization was dismissed without prejudice and with leave to amend, *id.* at 8–14 & 26, but no revised pleading was filed by the deadline of November 15, 2023.  Group14 has since withdrawn its discovery requests relating to the CPA and antitrust counterclaims, namely Requests for Production Nos. 65–70.  *See* LCR 37 Submission at 6 n.4 (docket nos. 65 & 68).

1    secrets." _Id._ at 25 (citing _RealD Spark LLC v. Microsoft Corp._, No. 22-cv-942, 2023 WL

2    3304250 (W.D. Wash. May 8, 2023)).

3    **C.**    **Current Motion**

4        In December 2023, Group14 served its third supplemental response to Nexeon's

5    Interrogatory No. 1, which asked Group14 to "[i]dentify all facts and documents

6    sufficient to show with reasonable specificity the 'manufacturing processes, know-how,

7    and precise measurements and properties' that [it] contend[s are] . . . trade secrets." _See_

8    Ex. 4 to Pivovar Decl. (docket no. 70 at 7).  Nexeon persists in its refusal to answer a

9    number of Group14's discovery requests based on the belief that Group14 still has not

10   adequately described its trade secrets.  The parties are again at an impasse, and now

11   before the Court is Group14's renewed motion to compel discovery.

12       Despite the additional thirty-six (36) pages of images, diagrams, charts, graphs,

13   tables, bulleted presentation slides, and verbiage supplied by Group14 in its supplemental

14   interrogatory response, the Court concludes that Group14 has not yet provided the level

15   of detail necessary under the circumstances to provide reasonable notice of its trade

16   secrets, and the Court will not, given the current record, compel Nexeon to open its

17   filing cabinets and the like for Group14 to peruse.  _See M/A-COM Tech. Sols., Inc. v._

18   _Litrinium, Inc._, No. SA CV 19-220, 2019 WL 4284523, at *2 (C.D. Cal. June 11, 2019)

19   (recognizing that the requisite particularity can be "more exacting" when the trade secrets

20   involve "incremental variations on, or advances in[,] the state of the art" because they

21   must be distinguished "from matters already known to persons skilled in [the] field"

22

23

ORDER - 5

1   (quoting *Advanced Modular Sputtering, Inc. v. Superior Court*, 132 Cal. App. 4th 826,

2   836, 33 Cal. Rptr. 3d 901 (2005))).[4]

3   _____

4   [4] Both parties cite to *Advanced Modular Sputtering*, in which the California Court of Appeal
interpreted a California statute that provides in relevant part:

5       In any action alleging the misappropriation of a trade secret under the Uniform
        Trade Secrets Act . . . , before commencing discovery relating to the trade secret,
6       the party alleging the misappropriation shall identify the trade secret with
        reasonable particularity . . . .

7   CAL. CIV. PROC. CODE § 2019.210 (emphasis added).  The *Advanced Modular Sputtering* Court
concluded that the statute requires a plaintiff to "make some showing that is reasonable, i.e., fair,
8   proper, just and rational, under all of the circumstances to identify its alleged trade secret in a
manner that will allow the trial court to control the scope of subsequent discovery, protect all
9   parties' proprietary information, and allow them a fair opportunity to prepare and present their
best case or defense at a trial on the merits."  132 Cal. 4th at 836 (citation omitted).  In two
10  of the four districts in California, Section 2019.210 is viewed as a procedural rule that conflicts
with the Federal Rules of Civil Procedure and therefore cannot be applied.  *See* *AtPac, Inc. v.*
11  *Aptitude Sols., Inc.*, No. CIV S-10-294, 2010 WL 11571246 (E.D. Cal. Sep. 22, 2010);
*Hilderman v. Enea TekSci, Inc.*, No. 05cv1049, 2010 WL 143440 (S.D. Cal. Jan. 8, 2010) (citing
12  *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938) (holding that federal courts sitting in diversity
apply state substantive law and federal procedure), and *Hanna v. Plumer*, 380 U.S. 460 (1965)
13  (clarifying that federal rules govern over conflicting state procedures unless they are outside the
scope of the Rules Enabling Act or are otherwise unconstitutional)); *Funcat Leisure Craft, Inc. v.*
14  *Johnson Outdoors, Inc.*, No. S-06-533, 2007 WL 273949 (E.D. Cal. Jan. 29, 2007).  In the other
two districts in California, Section 2019.210 has been used as guidance.  *See* *M/A-COM*, 2019
15  WL 4284523, at *2 (declining to reach the issue of whether Section 2019.210 is procedural or
substantive for purposes of the *Erie* doctrine, but concluding that the requirements set forth in the
16  statute were "warranted and appropriate to assist in the orderly and expeditious handling of
discovery"); *Advante Int'l Corp. v. Mintel Learning Tech.*, No. C 05-1022, 2006 WL 3371576,
17  at *3 n.4 (N.D. Cal. Nov. 21, 2006) (noting that Section 2019.210 "provides an appropriate guide
in the absence of specific provisions in the federal rules governing trade secret discovery");
18  *Excelligence Learning Corp. v. Oriental Trading Co.*, No. 03-CV-4947, 2004 WL 2452834, at
*3 n.3 (N.D. Cal. June 14, 2004) (ruling that Section 2019.210 (formerly 2019(d)) is "not
19  binding," but adopting the state's discovery requirements because "no parallel trade secret
discovery provision [is] set forth in the Federal Rules of Civil Procedure").  The approach of the
20  Central and Northern Districts is consistent with the results reached by the Eastern and Southern
Districts in *AtPac* and *Hinderman*, respectively; in *AtPac*, although the district court overruled
21  the defendants' discovery objections premised on Section 2019.210, it concluded that the
plaintiff had failed to make a complete initial disclosure concerning its trade secrets as required
22  by Federal Rule of Civil Procedure 26(a), *see* 2010 WL 11571246, at *1–2, and in *Hilderman*,
the district court made clear that, regardless of whether Section 2019.210 applies, a party
alleging trade secret misappropriation must still give "fair notice" or "fair warning" about its
claim by identifying the trade secrets at issue, *see* 2010 WL 143440, at *3–4.  In this matter,
23  because Group14 does not assert any claim under California's version of the Uniform Trade

1  **Discussion**

2  **A.**    **Applicable Standards**

3           In denying Group14's earlier motion to compel discovery, the Court relied on

4  certain principles and guidelines articulated by The Sedona Conference, including:

5           **Principle No. 3**:  The party claiming the existence of a trade secret must
            identify the asserted trade secret at a level of particularity that is reasonable
6           _under the circumstances_.

7           **Guideline 4**:  The identification of an asserted trade secret under a protective
            order or equivalent agreement between the parties should be made with
            sufficient particularity to allow the defendant to _meaningfully compare_ an
8           asserted trade secret to information that is generally known or readily
            ascertainable and to permit the parties and the court to understand what
9           information is claimed to be a trade secret.

10 Order at 17 (docket no. 56) (emphasis added, citing The Sedona Conference, _Commen-_

11 _tary on the Proper Identification of Asserted Trade Secrets in Misappropriation Cases_,

12 22 SEDONA CONF. J. 223, 231–33 (2021)).  The above-quoted language is consistent with

13 the Ninth Circuit's adoption of a "reasonable specificity" standard.  _See_ _Imax Corp. v._

14 _Cinema Techs., Inc._, 152 F.3d 1161, 1167 (9th Cir. 1998); _see also_ _MAI Sys. Corp. v._

15 _Peak Comput., Inc._, 991 F.2d 511, 522 (9th Cir. 1993) ("[A] plaintiff who seeks relief for

16 misappropriation of trade secrets must identify the trade secrets and carry the burden of

17 showing that they exist.").  Group14 does not challenge the Court's earlier analysis,[5]

18

19 _____

20 Secrets Act, the Court need not address whether Section 2019.210 controls, and the Court has
   considered the statute and related decisions only to the extent consonant with Ninth Circuit
21 jurisprudence.

22 [5] In its previous ruling, the Court distinguished between the trade-secret showing necessary to
   survive a Rule 12(b)(6) motion to dismiss and the disclosure required in response to a query in
   discovery about the nature and scope of the alleged trade secret.  _See_ Order at 15–16 (docket
23 no. 56).  With regard to the latter stage of litigation, the Court was persuaded by a decision cited

1    but rather argues that its third supplemental response "readily meets" The Sedona

2    Conference's standards.  *See* LCR 37 Submission at 8 (docket nos. 65 & 68).  The Court

3    disagrees.

4           In defining its trade secrets,[6] Group14 relies on three types of evidence:

5    (i) correspondence between the parties; (ii) slides shared by Group14 with Nexeon during

6    presentations and teleconferences; and (iii) Nexeon's internal communications.  The

7    Court has examined these various materials, and it concludes that they do not identify

8    any trade secret with the requisite level of particularity to provide Nexeon with the

9    information necessary to mount a defense.  *See* *DeRubeis v. Witten Techs., Inc.*, 244

10   F.R.D. 676, 680–81 (N.D. Ga. 2007).

11   **B.    Correspondence Between the Parties**

12          In its third supplemental interrogatory response, Group14 cited to an email dated

13   May 8, 2017, received from one of Nexeon's engineers, to support its contention that

14   certain information was not disclosed in the application giving rise to the '950 Patent and

15   therefore constitutes trade secrets.  *See* Ex. 4 to Pivovar Decl. at 47–48 (docket no. 70

16   at 48–49).  The email began:

17          We have now had an opportunity to have read through your recently
             published patent application WO 2017/040299 A1.[7]  Listed below are a
18

_____

19   in the parties' prior LCR 37 submission, *see* *RealD*, 2023 WL 3304250, at *3–4, to follow the
     Sedona Conference's guidance.  *See* Order at 17–18 (docket no. 56).

20   [6] Group14 has provided a set of sixteen (16) bullet points that allegedly identify its trade secrets.
     LCR 37 Submission at 9–10 (docket no. 68).  Nexeon has questioned seriatim each of Group14's
21   categories of proprietary information.  *See id.* at 21–25.  The Court has organized its analysis in a
     different fashion, but all of the asserted trade-secret components are discussed.
22

     [7] In August 2016, Group14's predecessor, EnerG2 Technologies, Inc. ("EnerG2"), filed an
23   application titled "NOVEL MATERIALS WITH EXTREMELY DURABLE INTERCALATION OF LITHIUM

number of questions we have identified that we would like to cover please as part of our discussion in the call tomorrow.  The output will form part of what we present to the Nexeon Board on 24th May.

*Id.* at 48 (docket no. 70 at 49).[8]  The message proceeded to ask six (6) questions about the chemical vapor deposition ("CVD") process,[9] two (2) questions concerning the requisite carbon scaffold, and one (1) question about the "overall process."  *Id.*  These inquiries do not indicate that Nexeon understood Group14 to have retained any trade secrets after applying for its patent.  Rather, the first and third questions about the CVD process observe that "the *patent* covers a range of techniques" and seek information about the "preferred" method, *i.e.*, an embodiment that would be protected by the patent, as opposed to trade secret laws.  *Id.* (emphasis added).[10]  With regard to the carbon scaffold,

---

AND MANUFACTURING METHODS THEREOF," which was published on March 9, 2017, as International Publication No. WO 2017/040299 A1.  The application proposes 82 claims, only some of which appear in the '950 Patent.  *Compare* Int'l Publ'n No. WO 2017/040299 A1 *with* '950 Patent at Claims 1–18.

[8] Group14 has designated its third supplemental response to Nexeon's first interrogatory as "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," *see* Ex. 4 to Pivovar Decl. at 17 (docket no. 70 at 18), and it has filed the document under seal without providing, for public view, an appropriately-redacted version.  *See* Ex. 4 to Pivovar Decl. (docket no. 66-4).  The quoted and/or paraphrased portions of the email at issue, which was reproduced in Group14's supplemental interrogatory response, do not satisfy the standards for sealing materials, and the Court perceives no need to seal or redact segments of this Order.  *See* Local Civil Rule 5(g); *see also Kamakana v. City & County of Honolulu*, 447 F.3d 1172, 1178–80 (9th Cir. 2006); *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135–36 (9th Cir. 2003).

[9] The '950 Patent describes two methods of chemical vapor deposition:  (i) subjecting porous carbon particles to elevated temperature for a period of time in the presence of silane gas (or silicon-containing gas); and (ii) subjecting porous silicon material to elevated temperature for a period of time in the presence of "suitable deposition gas containing carbon atoms," including "methane, propane, butane, cyclohexane, ethane, propylene, and acetylene."  *See* '950 Patent at 30:35–40 & 33:4–9.

[10] Group14's suggestion that Nexeon knew it was seeking trade secrets is not supported by any of Nexeon's other queries about the CVD process, namely what pressure was being used (closer to ambient or vacuum), whether the main reactor was "commercially demonstrated equipment,"

1    Nexeon attempted to learn merely whether the starting material was itself proprietary

2    and, if so, whether Nexeon could obtain a license for its use, as well as whether gases

3    other than hydrogen "need[ed] abatement," _see_ _id._, or, in other words, the intellectual

4    property ("IP") status and environmental impact of the process, not the technology

5    underlying it.  The final question in Nexeon's email asked which part of the process had

6    the most technical challenges and whether Group14 could provide a summary of its plans

7    to address them.  _Id._  When considered in context, neither this inquiry nor any of the

8    other inquiries in the email can be viewed as soliciting trade secrets.

9         Moreover, as noted by Nexeon, and acknowledged by Group14 in its discovery

10   response, _see_ Ex. 4 to Pivovar Decl. (docket no. 70 at 52:12–25), even if the May 2017

11   email could be viewed as probing for trade secrets, Group14 did not actually disclose

12   anything proprietary in response.  _See_ Ex. 9 to Lindberg Decl. (docket no. 70-2 at 2–3).[11]

13   Rather, Group14's chief technology officer ("CTO") replied to four of the nine questions

14   posed in the May 2017 message, including the inquiry about the "overall process," by

15   proposing to defer further discussion "until after our companies pass the next hurdle" or

16   "are deeper in due diligence," or by simply stating that he "would rather not share more

17   specific details . . . until the right time."  _See_ Ex. 9 to Lindberg Decl. (docket no. 70-2 at

18

19   whether an opportunity existed for Group14 and Nexeon to collaborate, and whether Group14
20   could share a "bill of materials."  Ex. 4 to Pivovar Decl. (docket no. 70 at 49).

21   [11] This document was filed under seal, but the portions quoted or paraphrased in this Order do
     not meet the applicable test for preventing public access to judicial records.  _See_ Minute Order at
22   ¶ 1 (docket no. 82) (previously advising the parties that, "if the Court must reproduce in its
     rulings verbiage from any of these (or other) sealed documents, the Court will consider at that
23   time whether such language must be made publicly available via inclusion in an unsealed order
     or minute order and/or the unsealing of the materials.").

2–3).  The CTO's other answers described Group14's plans and goals in vague terms

with no details, for example, "we are in discussions with our equipment vendor," "we are

striving to get as close as possible to 100% utilization," and "[w]e are exploring both

existing commercial-scale reactor designs . . . and developing our own reactor concepts."

*Id.* (docket no. 70-2 at 2).  The Court concludes that Group14 has not identified with any,

let alone reasonable, particularity a trade secret that was provided to Nexeon in the email

chain at issue.

**C.   <u>Presentations and Teleconferences</u>**

In its third supplemental interrogatory response, Group14 also included various

presentation slides that were shared with Nexeon (i) during the course of two "summits"

held in Seattle at Group14's laboratory facilities, or (ii) via teleconferences.  In support of

its motion to compel discovery, Group14 has also offered a declaration by its expert,

Steve W. Martin, Ph.D., which purports to explain the content of each slide, and which

states in conclusory fashion that the information in the slides was not disclosed by or

readily ascertainable from the '950 Patent, a related published application,[12] or "other

Group14 public disclosures."  *See* Martin Decl. at ¶¶ 19 & 21–36, Ex. 5 to Pivovar Decl.

(docket no. 70-1).[13]  The slides at issue fall into three categories:  (i) slides that compared

---

[12] The invention described in the '950 Patent was disclosed in both (i) International Publication
No. WO 2017/040299 A1, and (ii) Publication No. US 2017/0170477 A1.  Dr. Martin has not,
however, mentioned the latter document, which made public, as of June 15, 2017, EnerG2's
Application No. 15/248,830, which ripened into the '950 Patent.

[13] Dr. Martin has defined "other Group14 public disclosures" as including *only* four international
publications (WO 2013/120011, WO 2014/201275, WO 2017/040299, and WO 2018/165610)
and materials presented to the United States Department of Energy on June 8, 2017.  Martin
Decl. at ¶ 19, Ex. 5 to Pivovar Decl. (docket no. 70-1).  Dr. Martin has misidentified one of the

1  batches of Group14's composite materials; (ii) slides that outlined alternatives Group14

2  had explored; and (iii) slides that relate to the manufacturing process.

3      **1.**     **Comparisons**

4      The first set of slides simply disclose specific values within the ranges of figures

5  set forth or claimed in the '950 Patent.  For example, the slides labeled (i) G14_0001316

6  (dated July 25, 2017), (ii) G14_0001335 (dated August 29, 2017), and (iii) G14_0007055

7  (relating to the October 2017 Summit) report certain physiochemical properties for four

8  (4) different batches of product.  _See_ Ex. 4 to Pivovar Decl. at 22–24 (docket no. 70 at

9  23–25).  Such properties are discussed in an almost 12-page section of the '950 Patent

10  labeled "Physicochemical Properties of Composites with Extremely Durable Insertion of

11  Lithium that Influence Electrochemical Performance."  '950 Patent at § J, 51:11–74:29.

12  According to the '950 Patent, traditional carbon anodes limit the power, capacity, and

13  cycle life of an electrical storage device (rechargeable battery) because they:  (i) restrict

14  the movement of lithium ions to the two-dimensional plane between layers of graphite;

15  (ii) have an "ordered and crystalline structure" that requires six (6) carbon atoms for each

16  lithium ion; and (iii) expand, contract, and shift during battery operation.  _Id._ at 1:55–61,

17  2:15–20, & 51:14–31.  The '950 Patent postulates that, when the disclosed invention, _i.e._,

18  the Si-C composite, is used in a battery anode, improved electrochemical performance is

19  

---

20  publications (WO 2017/040299) as "the counterpart to the '103 Patent."  _See id._  _But see id._ at
   ¶ 14 (indicating that WO 2014/143213, rather than WO 2017/040299, shares the same disclosure

21  as the '103 Patent); '103 Patent (tracking International Publication No. WO 2014/143213's
   description, but _not_ its claim language).  Given Dr. Martin's obvious citation error, and his

22  failure to discuss the '103 Patent itself or any of the other patents obtained by Group14, the
   Court concludes that Dr. Martin's opinions relating to "other Group14 public disclosures" is

23  entitled to no weight.

achieved as a result of the physiochemical properties of the carbon scaffold and the impregnated silicon.  *See id.* at 4:38–46 & 51:32–37.

The '950 Patent identifies the following physiochemical properties as being predictive of "extremely durable" intercalation of lithium:  (i) silicon content (loading) by percentage weight; (ii) total specific surface area, which is typically expressed in units of square meters per gram ($m^2/g$); (iii) pore volume; (iv) pore size or volume distribution, quantified as the percentages, respectively, of macropores (over 50 nanometers (nm) in diameter), mesopores (2–50 nm in diameter), and micropores (less than 2 nm in diameter) in the scaffold or the composite; (v) silicon particle size distribution, described as a specific dimension at a percentage of the volume distribution, for example, 5 nm at "Dv,50" means a particle size of five nanometers at fifty percent (50%) of the volume distribution, which would be equivalent to the "average particle size," *see id.* at 59:40–43; (vi) span of particle sizes at "Dv,10," "Dv,50," and "Dv,90" (10%, 50%, and 90% of the volume distribution, respectively); and (vii) ratio of lithium atoms to carbon atoms (abbreviated as Li:C).  *See id.* at 10:21–39, 11:36–40, & 56:26–61:35; *see also* '103 Patent at 2:14–22.  The ranges for these properties are stated in the '950 Patent with respect to both "composite material exhibiting extremely durable intercalation of lithium," *e.g.*, '950 Patent at 56:26–27, and certain embodiments of the patented invention, as summarized in the following table:

| Physiochemical Property | Low | High |
|---|---|---|
| Silicon Content (Loading) | 5% | 95% |
| Surface Area | 10 $m^2/g$ < 0.1 $m^2/g$ | 200 $m^2/g$ > 500 $m^2/g$ |

| Physiochemical Property | Low | High |
|---|---|---|
| Pore Volume | $0.01 \ cm^3/g$ | $0.2 \ cm^3/g$ |
| Pore Size Distribution<br>expressed as less than a percentage of micropores, less than a percentage of mesopores, and more than a percentage of macropores | < 0.1%<br>micropores<br>mesopores | > 99.9%<br>macropores |
| Silicon Particle Size Distribution<br>described in nanometers ($10^{-9}$ m) (nm) and microns, also known as micrometers ($10^{-6}$ m) (μm) | Dv,0: 1 nm<br>Dv,50: 5 nm<br>Dv,100: 8 nm | Dv,0: 5 μm<br>Dv,50: 20 μm<br>Dv,100: 100 μm |
| Span of Particle Sizes<br>expressed as Dv,50 to Dv,90–Dv,10 | 2 to 1 | 100 to 10 |
| Li:C Ratio | 0.05:6 | 2.5:6 |

The comparison slides do nothing more than report the properties of particular batches of composite materials.  None of the numerical figures contained in the slides fall outside the values set forth in the '950 Patent, which are shown in the preceding table. Group14 makes no argument that the test products discussed in the comparison slides were not embodiments of the invention disclosed in the '950 Patent.[14]  At most, the comparison slides might be viewed as reflecting more specific goals for certain physiochemical properties, but they still reflect the practice of the invention described in the patent, as opposed to any trade secret.  The comparison slides provide no information concerning the methods employed in generating the batches at issue, and they do not satisfy Group14's obligation to identify its trade secrets with reasonable specificity.

---

[14] Silicon content by weight, pore structure defined with respect to pore size distribution, pore size or volume, ratio of carbon scaffold pore volume to silicon volume, average particle size, and carbon scaffold surface area are each an element of one or more claims of the '950 Patent.  *See* '950 Patent at Claims 1, 7–14, 16, & 26–28.

1        ## 2.    **<u>Alternatives</u>**

2        The second group of slides included in Group14's supplemental interrogatory

3    response are alleged to disclose "negative know-how." <u>See</u> Martin Decl. at ¶ 22, Ex. 5 to

4    Pivovar Decl. (docket no. 70-1).  A slide labeled G14_0024051, apparently prepared for

5    the June 2017 Summit, however, merely recounts what was "explored," as opposed to

6    which alternatives worked or did not work or were better or worse. <u>See</u> Ex. 4 to Pivovar

7    Decl. (docket no. 70 at 26).  In his declaration, Group14's expert (Dr. Steve Martin)

8    summarizes what the slide allegedly teaches, but his interpretation is not included in

9    Group14's discovery response, <u>compare</u> Ex. 4 <u>with</u> Ex. 5 to Pivovar Decl. (docket

10    nos. 70 & 70-1), and it goes beyond the actual wording of the presentation material

11    without citing to any evidence concerning the content of conversations accompanying the

12    slide during the June 2017 summit.  In contrast, Nexeon has offered testimony from one

13    of Group14's employees, Chris Timmons, indicating that Group14 opted not to disclose

14    certain "proprietary" information during the June 2017 summit, but during his deposition,

15    Timmons could not "recall any specifics."  Timmons Dep. at 195:2–196:24, Ex. 11 to

16    Lindberg Decl. (docket no. 70-4).

17        Another slide also labeled G14_0024051 contains two graphs and two bullet

18    points, one of which has two subpoints.  Ex. 4 to Pivovar Decl. (docket no. 70 at 27).

19    Dr. Martin has explained that this slide discloses a specific "theoretical maximum weight

20    percent of Si" and teaches that, "[b]y not filling the [carbon] pores to 100%, the

21    infiltrated Si has available free-volume to expand and contract without creating stress

22    during charging (lithiation) and discharging (delithiation)."  Martin Report at ¶ 23, Ex. 5

23

to Pivovar Decl. (docket no. 70-1 at 20).  Notably, this information is not explicitly stated within the bullet points and subpoints of the slide, but it is reflected in the '950 Patent. _See_ '950 Patent at 73:50–56 ("[C]omposite materials in certain embodiments will comprise a fraction of trapped pore volume, namely, void volume non-accessible to nitrogen gas as probed by nitrogen gas sorption measurement.  Without being bound by theory, this trapped pore volume is important in that it provides volume into which silicon can expand upon lithiation.").  Group14 has not sufficiently identified what, if any, information in the slide at issue constitutes a trade secret.

Yet another slide associated with the June 2017 summit, labeled G14_0001418, offered broad, generic descriptions of the carbon being employed and the processes being developed, and indicated that, for producing its own scaffold, Group14 had "potential for access to E2[15] equipment and resources" or "external vendor equipment and resources." Ex. 4 to Pivovar Decl. (docket no. 70 at 28).  The statements in this slide are so vague, speculative, and/or forward-looking that they cannot be considered trade secrets.

### 3.   **Manufacturing Process**

The last category of slides includes (i) results of thermogravimetric or thermal gravimetric analysis ("TGA"), which is characterized in the '950 Patent as "a technique known in the art," _see_ '950 Patent at 78:2–3; (ii) information about a lab-scale process, pilot-scale equipment, and scale-up plans and progress; (iii) lists of customers, investors,

---

[15] E2 presumably refers to Group14's predecessor EnerG2.  The possible use of EnerG2's equipment and resources cannot be considered a trade secret given that EnerG2 was identified as the applicant in the international publication associated with the '950 Patent.  _See_ Int'l Publ'n No. WO 2017/040299 A1.

1   suppliers, and vendors; and (iv) commercial-scale financial projections.  *See* Ex. 4 to

2   Pivovar Decl. (docket no. 70 at 29–47).

3                a.       **Thermogravimetric Analysis**

4          Although referenced in the '950 Patent, TGA is more fully explained in a different

5   patent procured by Group14, namely U.S. Patent No. 11,335,903 ("'903 Patent").  TGA

6   is a destructive method used in this context to quantify the amount and location of silicon

7   within an Si-C composite.  *See* '903 Patent at 3:27–29 & 3:44–4:14.  The TGA process

8   entails heating the Si-C composite from 25℃ to 1100℃, which burns off all of the

9   carbon and oxidates all of the silicon to $SiO_2$ (silicon dioxide), and taking measurements

10  of the material's mass at different temperatures.  *Id.* at 3:29–43.  The percentage of

11  silicon within the composite (in other words, the amount of silicon loading) and the

12  fraction of the silicon that was impregnated within the pores of the carbon scaffold (as

13  opposed to deposited on particle surfaces) may then be calculated by using the formulas

14  set forth in the '903 Patent.  *See id.* at 3:32–43 & 3:63–4:14.  This data provides an

15  indication of whether the Si-C composite has the characteristics believed to provide high

16  charge/discharge rates and robustness for lithium-ion battery anode applications, namely

17  a high silicon content with most, if not all, of the silicon particles being amorphous

18  (rather than crystalline), nano-sized, and imbedded within the pores of the carbon

19  scaffold.  *See id.* at 1:33–42 & 3:4–26.

20         Dr. Martin refers to this testing technique, which was previously known in the art,

21  as Group14's "TGA trade secret method," and he refers to the obtained results as "TGA

22  metrics."  *See* Martin Decl. at ¶ 25, Ex. 5 to Pivovar Decl. (docket no. 70-1).  Dr. Martin

23

does not, however, acknowledge that the use of TGA to gain "insight" into the Si-C composite "structure," as well as the data he calls the TGA metrics, were disclosed, on June 8, 2017, in a presentation to the United States Department of Energy, *see* Ex. 8 to Lindberg Decl. (docket no. 67-2 at 20), the slides for which were marked with the following words: "This presentation does **not** contain any proprietary, confidential, or otherwise restricted information." *Id.* (docket no. 67-2 at 2) (emphasis added).



*Id.* The graph in the slide labeled G14_0001200 and G14_0001214, Ex. 4 to Pivovar Decl. (docket no. 70 at 29), which is dated March 2017 and which Dr. Martin has opined taught Nexeon a trade secret, is identical to the graph in the slide shown approximately three months later to the Department of Energy. In addition, the percentages reported for the "lab example" are the same in both documents. A redacted version of the slide shown to Nexeon in March 2017 (left) and the slide presented to the Department of Energy in June 2017 (right) are reproduced on the next page for comparison purposes.



*Id.* (redacted); Ex. 8 to Lindberg Decl. (docket no. 67-2 at 20). Moreover, in a slide used during the June 2017 Summit, Group14 indicated that the TGA "metric" had been "validated" in an article published in March 2017. *See* G14–0024051, Ex. 4 to Pivovar Decl. (docket no. 70 at 30) (alluding to T. Jaumann, M. Gerwig, J. Balach, S. Oswald, E. Brendler, R. Hauser, B. Keiback, J. Eckert, L. Giebeler, & E. Kroke, *Dichlorosilane-derived nano-silicon inside hollow carbon spheres as a high-performance anode for Li-ion batteries*, 5 J. MATERIALS CHEMISTRY A 9262 (2017)). Dr. Martin has made no reference to this article nor has he attempted to distinguish the alleged "TGA trade secret method" from the techniques publicly disclosed by the Argentinian, Austrian, and German scientists who authored the article in the Journal of Materials Chemistry A. Group14 has not made the requisite showing of any trade secret associated with thermogravimetric analysis.

### b. Processes, Plans, and Progress

In its supplemental interrogatory response, Group14 has included five slides that articulated the advantages and disadvantages of a lab-scale silane deposition process. *See* G14–0001418, Ex. 4 to Pivovar Decl. (docket no. 70 at 31–33). These slides include

1   minimal detail about the lab-scale method being evaluated. They do, however, indicate

2   that a "tube furnace" was employed and that such furnace produced undesirable results

3   because the temperature was not uniform along the length of the tube. *Id.* (docket no. 70

4   at 32–33). Other slides reflect that a "batch rotary kiln" was selected for pilot-scale

5   development, *id.* (docket no. 70 at 35–36), but this choice of equipment cannot be

6   considered a trade secret because the '950 Patent identifies rotary kilns as one of the

7   designs "known in the art" that would be "suitable" for chemical vapor deposition, *see*

8   '950 Patent at 30:56–60, and the '103 Patent contains two dependent claims in which the

9   only additional element is use of a rotary kiln, *see* '103 Patent at Claims 5 & 14.

10   Additional slides reflect that a rotary kiln with internal riffle flights had been selected, but

11   one of these slides further states that such technology is "patent-protected" and identifies

12   both the inventor and the assignee, Harper International Corp., as well as the patent-

13   application number.[16] *See* Ex. 4 to Pivovar Decl. (docket no. 70 at 43).

14       The remaining manufacturing-related slides either (i) contain flow diagrams,

15   which lack the detail necessary to view them as trade secrets, and which seem merely to

16   offer in illustrative form the steps described in the '950 and '103 Patents, or (ii) identify

17   key process parameters, but without providing any specific values for them or any inkling

18   of whether they should exceed or remain below some threshold. *Id.* (docket no. 70 at 39–

19   42). Given the level of detail set forth in the '950 and '103 Patents, which collectively

20

---

21   [16] The patent for the rotary kiln with riffle flights issued in 1999 and expired in 2018, twenty (20)

22   years after the application (No. 09/071,395) was filed. *See* U.S. Patent No. 5,997,289; *see also* 35 U.S.C. § 154(a)(2). When the slides at issue were shown to Nexeon, the patent for the riffle-

23   flight kiln was less than a year away from expiring and the technology was far from being a trade secret.

1  contain 181 pages, 86 examples, and 82 numbered embodiments, Group14 must do much

2  more to identify with the requisite reasonable particularity the "manufacturing processes

3  . . . to achieve commercially viable Si-C composite BAM" that it asserts in its operative

4  pleading are trade secrets.  *See* Compl. at ¶¶ 49 & 57 (docket no. 1).

5     **c.**  **Customers, Investors, Suppliers, and Vendors**

6    Although customer (and perhaps investor) lists might, in certain circumstances,

7  constitute trade secrets, Group14 makes no showing that general verbiage like "multiple

8  companies" in "Asia and Europe," which is contained in one of the slides labeled

9  G14_0001418, Ex. 4 to Pivovar Decl. (docket no. 70 at 45), or the identities of five (5)

10  Fortune 500 companies with well-documented, pre-2017 interests in lithium-ion battery

11  technology qualify as trade secrets.  Neither Group14 nor its expert attempts to assert that

12  the names of Group14's customers and investors were not readily ascertainable.  *See Ed*

13  *Nowogroski Ins., Inc. v. Rucker*, 137 Wn.2d 427, 441, 971 P.2d 936 (1999) ("Trade secret

14  protection will not generally attach to customer lists where the information is readily

15  ascertainable."); *see also Perrin Bernard Supowitz, LLC v. Morales*, No. 22-cv-2120,

16  2023 WL 1415572, at *7 (C.D. Cal. Jan. 31, 2023) ("the most important consideration is

17  whether the information is readily accessible to a reasonably diligent competitor"

18  (quoting *Hollingsworth Solderless Terminal Co. v. Turley*, 622 F.2d 1324, 1332 (9th

19  Cir. 1980))).

20    Group14 and its expert focus instead on the suppliers and vendors enumerated in

21  the aforementioned slide and a slide labeled G14–0001394, Ex. 4 to Pivovar Decl.

22  (docket no. 70 at 46–47).  One of the manufacturers, which was mentioned in both slides,

23

1   is Harper International Corp. ("Harper"), which held the patent on riffle-flight kilns, and

2   which was therefore, in 2017, the only entity capable, in the absence of a license, of

3   providing such equipment.  Group14 cites no authority to support combining trade secret

4   law with patent law in a manner that would preclude a patentee's customer's competitor

5   (in this context, Nexeon) from gaining access, through the patentee (Harper), to the

6   publicly-disclosed invention, and would thereby confer on the customer (Group14) an

7   unsanctioned monopoly.  *Cf. Perrin*, 2023 WL 1415572, at *11 ("If the mere identity of

8   [an entity's] vendors is a trade secret, then trade secret law would effectively prevent

9   [others] from competing altogether because it would prevent them from buying products

10  from any vendors who sold products to [the entity].  This cannot be the result.").  Given

11  the lack of rigor in Dr. Martin's analysis regarding a key vendor (Harper), which was

12  listed with respect to three of the eight segments of Group14's pilot-scale process, the

13  Court declines to accept Dr. Martin's opinion that the supplier and vendor information at

14  issue was not readily ascertainable.

15          d.      **Commercial-Scale Financial Projections**

16          Group14 has included within its supplemental interrogatory response three slides

17  labeled G14_0001418, Ex. 4 to Pivovar Decl. (docket no. 70 at 46–48), that outline

18  projections for commercial-scale costs of goods sold ("COGS"), and it refers to these

19  slides in its motion to compel discovery, *see* LCR 37 Submission at 10 (docket no. 68).

20  Neither Group14 nor its expert, however, has offered any basis for why such information

21  would constitute trade secrets.  Presumably, the costs of raw materials and overhead

22  expenses, only some of which (namely direct labor and electricity) appeared in the slides

23

1   at issue, are within a business's capability to compute for itself, and Group14 has not

2   demonstrated that the figures set forth in the presentation materials had independent

3   economic value, *i.e.*, were of benefit to companies other than Group14.  Notably, the

4   slides do not contain the prices that Group14 intended to charge or its projected profit

5   margins, and given Group14's and its expert's silence on the subject, the Court finds

6   nothing in the COGS slides that would have offered Nexeon the type of competitive

7   advantage generally associated with trade secrets.

8   **D.   Nexeon's Internal Communications**

9        In its reply in support of its motion to compel discovery, Group14 quotes from an

10  email authored by Nexeon's Chief Engineer Bill Macklin, Ph.D., as evidence that Nexeon

11  "developed 'NSP2' using Group14's trade secrets."  LCR 37 Submission at 28 (docket

12  no. 68 at 35).  Dr. Macklin's email refers to two samples supplied by Group14 and

13  related data from which Nexeon made certain calculations to support "the hypothesis that

14  *we* have successfully used the voids present."  Ex. 17 to Pivovar Decl. (docket no. 70-8)

15  (emphasis added).  Dr. Macklin further stated that "***this*** is the first example and direct

16  evidence of an NSP2 candidate material."  *Id.* (emphasis added).  Whether the "this"

17  mentioned in the email was Group14's Si-C composite or a different product (perhaps

18  developed by Nexeon, which was possibly the "we" in the preceding sentence) is unclear,

19  but the response from Nexeon's IP Director Christopher Michael Friend, Ph.D., which

20  Group14 has not mentioned in the LCR 37 Submission, shows that Nexeon was

21  attempting to avoid any misappropriation:

22       The silicon needs to be deposited in exactly the right way to use all the pore
         space and this may correlated with the carbon pore size distribution (for a
23

ORDER - 23

fixed value of overall porosity) plus silane deposition process parameters.  If we can capture the correlations we could get IP that is distinguished over the published G14 patents (*and not related to their trade secrets/confidential info*).

*Id.* (emphasis added).

In a document dated November 20, 2017, which was almost three months after Drs. Macklin and Friend exchanged the quoted emails, a Nexeon employee (Charles Mason) described Phase 1 of proposed research-and-development scale silicon-deposition trials as "assess[ing] the repeatability of G14 *patent* examples using Nexeon sourced carbon scaffolds."  Ex. 18 to Pivovar Decl. (docket no. 70-9 at 4) (emphasis added).  In other words, Nexeon was planning to test whether it could make Group14's patented Si-C composite starting with its own carbon material.  To the extent that Nexeon actually practiced Group14's invention without authorization, Group14's remedy lies within the statutes and jurisprudence governing patents, as opposed to trade secret law.  And, to the extent that Nexeon's employees (Mason, Richard Taylor, and Dr. Friend) are not the inventors (or not the only inventors) of the "particulate material comprising a plurality of composite particles" that is claimed in the '786 Patent, *see* '786 Patent at Claim 1, but rather took credit for Group14's work, Group14's avenues of relief are to seek joinder of any omitted inventor, *see* 35 U.S.C. §§ 116 & 256; *see also Stark v. Advanced Magnetics, Inc.*, 119 F.3d 1551, 1555 (Fed. Cir. 1997) (holding that Section 256 "allows deletion of a misjoined inventor whether that error occurred by deception or by innocent mistake" and the "addition of an unnamed actual inventor," if such "unnamed inventor is free of deceptive intent"), or to challenge the '786 Patent on the basis of inequitable conduct, *see PerSeptive Biosystems, Inc. v. Pharmacia Biotech, Inc.*, 225 F.3d 1315 (Fed. Cir. 2000).

1    Given the statutory presumption of validity that attaches to the '786 Patent, *see* 35 U.S.C.

2    § 282(a), the Court cannot consider the type of collateral attack Group14 attempts to

3    mount by alleging that the invention disclosed in the '786 Patent is the product of trade

4    secret misappropriation.  Thus, Nexeon's internal communications do not themselves

5    support Group14's request that it be permitted to conduct a "fishing expedition" to look

6    for evidence of wrongdoing; Group14 must first outline with "reasonable particularity"

7    the contours of its trade secrets.  *See* *DeRubeis*, 244 F.R.D. at 680–81.

8    **Conclusion**

9            For the foregoing reasons, the Court ORDERS:

10           (1)     Group14's motion to compel discovery, docket nos. 65 & 68, is DENIED.

11           (2)     The parties are DIRECTED to meet and confer and to file, within thirty

12   (30) days of the date of this Order, a Joint Status Report proposing a reset trial date and

13   related dates and deadlines.  In such Joint Status Report, the parties shall address whether

14   the Court should stay further discovery pending Nexeon's filing of, and the Court's

15   resolution of, a dispositive motion concerning Group14's federal and state claims for

16   trade secret misappropriation, as well as the portions of Group14's breach of contract and

17   unjust enrichment claims that are premised on the existence of a trade secret.

18           (3)     The Clerk is directed to send a copy of this Order to all counsel of record.

19   IT IS SO ORDERED.

20   Dated this 26th day of March, 2024.

21

22   _____

Thomas S. Zilly
United States District Judge

23